**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK DOWNS,** | ) | |
| **Plaintiff,** | ) | **Case No. 13 C 3998** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **ANDRE CARTER, FREDERICK LANG,** | ) | |
| **JOSE PRADA, LARRY CROSS, SYTERA** | ) | |
| **SANDERS, and MARCUS HARDY,[1]** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this conditions of confinement case arising under the Eighth Amendment, Illinois

prisoner Mark Downs (who is proceeding with the assistance of recruited counsel) contends that

he was housed for forty-five days in a cell at Stateville Correctional Center with plumbing issues

that deprived him of access to a functional toilet and drinking water, that he could not adequately

address his personal hygiene without running water, and that he failed to receive appropriate

cleaning supplies that were necessary to sanitize his cell. The defendants move for summary

judgment, contending that the record shows as a matter of law that the conditions in Downs' cell

did not rise to the level of a constitutional violation. Alternatively, they argue that they were not

deliberately indifferent because they either made reasonable efforts to address Downs'

complaints or were not personally involved in the attempts to resolve Downs' plumbing

problems. For the following reasons, the motion for summary judgment is granted in part and

denied in part.

---

[1] The record refers to defendant Jose Prado and Jose Prada. The court will use the latter spelling as it is consistent with how Prada spelled his name when he was deposed.

# I. BACKGROUND

## A. The Defendants' Request to Strike Down's Statement of Additional Facts

The defendants contend that Downs' forty-paragraph statement of additional facts (the maximum permitted by Local Rule 56.1(b)(3(C)) consists of improper compound facts. Downs' additional facts overwhelmingly consist of two to three related sentences that are supported by citations to the record.

The court has broad discretion when enforcing the local rules governing the presentation of motions for summary judgment. *See*, *e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). The groups of sentences in Downs' statement of additional facts are all interrelated and Downs' facts are neither prolix nor difficult to follow. Moreover, the defendants were able to respond in a clear and understandable manner. Although asserting more than one fact per paragraph may "expose the party to an argument that Local Rule 56.1 is being abused," no such abuse occurred here. *See Deffebaugh v. BNSF Ry. Co.*, 12 C 10244, 2015 WL 1230075, at *5 (N.D. Ill. Mar. 16, 2015). The defendants' request to strike Downs' additional facts is denied.

## B. Facts[2]

### 1. The Parties

Plaintiff Mark Downs is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and is incarcerated at Stateville Correctional Center ("Stateville"). At the relevant time (June 1, 2011, through July 14, 2011), defendant Marcus Hardy was Stateville's Warden. All of the other defendants were employed at Stateville: Jose Prada was a Correctional

---

[2] The following facts are drawn from the parties' Rule 56.1 submissions. The court has not considered statements of fact that are not supported by the cited portions of the record.

Sergeant, Larry Cross was a Correctional Lieutenant, Frederick Lang and Andre Carter were Correctional Officers, and Sytera Sanders was a Counselor.

## 2. The Conditions in Downs' Cell

From June 1, 2011, through July 14, 2011, Downs and Bernard Mims were housed in cell 503 of E-House at Stateville ("Cell E-503"), which is also known as Edward House. Cell E-503 is six feet by ten feet and is windowless. It contains bunk beds and a combination toilet/sink unit. It is undisputed that the toilet is a few inches from the bunk beds. E-House was on lockdown from July 7 through July 14, 2011.

In the summer of 2011, the correctional officers assigned to E-House made multiple rounds through the unit each day and Warden Hardy made rounds approximately once a week. The weather was hot and humid and the exterior temperature at times reached heat indexes of 110 degrees Fahrenheit. When the weather is hot and humid outside, the temperature rises inside Stateville. There is no air conditioning in the housing units or cells so the temperature can be ten to twenty degrees warmer than it is outside. Inmates at Stateville have suffered from heat-related illnesses and dehydration due to summer temperatures and humidity.

According to Downs, between June 1, 2011, and July 14, 2011, Cell E-503 did not have a working toilet or running water and a metal plate blocked the cell's air vent. Downs testified that correctional officers occasionally gave him ice to help the toilet flush, but that ice made matters worse as it clogged the toilet.[3] Downs described the toilet as filled up with human waste that was "cooked" by the high ambient temperature and stated that the cell was filled with a

---

[3] Flushing ice cubes does not appear to be a felicitous idea. Perhaps Downs meant that he attempted to flush the toilet after the ice melted. The record is unclear but the court will not consider this issue further as it does not affect the result.

"fowl [sic] odor 24/7". (Downs Dep. at 74.) Prada described the cell as "not livable." (Prada Dep. at 44.) Down testified that when Cell E-503 experienced plumbing problems, he felt "dangerously dehydrated" and had migraine headaches, painful urination, and symptoms of heat stroke due to the lack of access to water and a working toilet.[4] (Downs Dep. 65-66.)

The parties dispute how frequently the correctional officers took Downs to a cell with a working toilet. Downs testified that during the first week of June 2011, officers took him to a utility cell once a day so he could use the toilet and then took him periodically, "a couple days here, a couple days there."[5] (Downs Dep. at 38.) He contends that he was forced to hold his bodily waste for days at a time while waiting for the opportunity to use a functioning toilet and that eventually, he had to use the toilet in his cell, which eventually overflowed with feces and urine. In contrast, Prada and Lang testified that officers handling an inmate in a cell with a dysfunctional toilet would allow the inmate to use another toilet and would provide access to water throughout the day. According to Carter, during a lockdown, it was possible that guards would not receive permission to remove a prisoner from his cell to use an alternative toilet.

---

[4] The defendants dispute Down's description of his symptoms. In support, they point to Prada and Lang's testimony that they did not recall personally observing any overheated or dehydrated inmates. (Prada Dep. at 13; Lang Dep. at 20-21.) However, Prada and Lang did not testify that on the dates and times in question, they observed Downs and concluded that he was not experiencing heat/hydration-related symptoms. A general denial of knowledge regarding inmates who are suffering heat/hydration-related symptoms does not equate to evidence showing that Downs did not suffer these symptoms. At best, it creates a disputed issue of material fact about Downs' condition.

[5] The parties do not explain what a utility cell is. It appears to be a cell used for storage of items such as mops. Because it does not house inmates, the utility cell's toilet/sink unit is available as an emergency back-up for inmates who cannot use the facilities in their own cells.

Between June 1, 2011, and July 14, 2011, other than his visits to the utility cell, Downs had very few opportunities to access a working toilet because he did not hold a job at Stateville, have visitors, or visit the healthcare unit. Thus, he could not use the restrooms in those areas. It is unclear if inmates could use a restroom when they were taken to the yard for exercise or to the law library, but it is undisputed that when E-House was not on lockdown during the period at issue, Downs went to the yard two times per week and to the law library once per month. He went to the cafeteria to dine when E-House was not on lockdown, but there are no restrooms there.

Stateville was on lockdown between July 7, 2011, and July 14, 2011. During the lockdown, the parties dispute whether correctional officers allowed Downs to use a toilet outside of Cell E-503 or regularly supplied Downs with water and ice. Downs contends that while E-House was on lockdown, he went three days without receiving water. The defendants point to evidence indicating that guards in E-House give ice to inmates two or three times a day when temperatures exceed 80 degrees, but Downs asserts that they only did so "from time to time." (Downs Dec. at ¶ 13.) Prada contends that he brought Downs extra ice, while Downs denies that Prada ever brought any ice to Downs' cell. Downs drank water formed from allowing ice he received to melt, but it was very difficult to keep the melted ice clean and sanitary (apparently because correctional officers use items provided by inmates, such as cups and styrofoam plates, to hold ice).

Downs received his meals in his cell during lockdowns. Downs and Prada agree that inmates do not receive liquids with lunch or dinner during lockdowns as they are expected to drink water available in their cells. The parties disagree about whether Downs received

supplemental water with these meals. The evidence about liquids provided with breakfast during lockdowns varies: Downs testified that he received eight ounces of milk, Hardy testified that inmates occasionally received liquids, and Prada testified that inmates received milk or juice. When Stateville was not on lockdown, Downs went to the cafeteria for lunch and dinner. Water and/or juice is available in the cafeteria.

Inmates can purchase beverages, including water, through the commissary, which is available when Stateville is not on lockdown. On June 1, 2011, June 15, 2011, and July 6, 2011, when his cell was experiencing plumbing issues, Downs purchased jalapeno peppers, salted peanuts, and summer sausage from the commissary, but did not purchase any beverages. He explained that he did not buy beverages because he "was usually appeased by the officers telling [him] that they're going to move [him], the water is going to be fixed" and inmates "only go once a month to commissary, twice a month if [they are] lucky." (Downs Dep. at 33.)

**3.      Down's Ability to be Transferred to Another Cell**

A cell with working plumbing was available in F-House (also known as Frank House) soon after the plumbing issues arose in Cell E-503. Generally, inmates do not want to be housed in F-House because it is a less desirable housing unit. After the plumbing in Cell E-503 stopped working, Downs was told multiple times that he would be moved, and he eventually was moved to F-House on July 14, 2011.

The parties dispute whether Downs asked to be moved and whether he would have moved if offered the opportunity to do so. According to Downs, he was never given an opportunity to move prior to July 14, 2011, but if a move had been offered, he would have accepted immediately. Hardy testified that he did not believe that inmates should have any input

in where they are housed.  Lang recalled that both Downs and his cellmate, Mims, did not want to move due to concerns about whether they would be able to return to Cell E-503.  According to Lang, Mims was adamant about not wanting to move to F-House due to a roach infestation there. Cross testified that inmates often did not want to move because they could lose their cell or cellmate and that Stateville accommodated this request by making alternative arrangements to address issues that were awaiting repair.

Prada testified that if inmates told him they did not want to be moved while a repair was pending, he would advise the placement office and the inmate's preference would be taken into account.  Prada further testified that he offered a cell in F-House to Downs and that Downs declined to move.  Lang testified that if Downs had asked to be moved, he would promptly have "gone without a doubt" to F-House.  (Lang Dep. at 76.)

### 4.      The Repair Process at Stateville

When an inmate at Stateville complains about an issue with his cell, such as a broken toilet or sink, an officer fills out a work order.  After a lieutenant approves the work order, it is sent to Stateville's chief engineer's office. The chief engineer assigns a maintenance crew to perform necessary repairs.  Typically, an issue is resolved within a few days after a work order is submitted.  While a repair to the toilet/sink unit is pending, officers generally modify the inmate's schedule to allow him access to water and a functioning toilet.

Downs complained repeatedly to guards regarding the broken plumbing in Cell E-503. The guards initially told him that the toilet/sink unit would be fixed.  The parties dispute the number of work orders about Cell E-503's plumbing issues that were submitted in June and July 2011.  The evidence about the work orders is inconsistent:  Downs testified both that he had seen

two work orders and that he had seen three or four work orders.  Cross testified that there were

five work orders, Lang testified that he signed and submitted "a couple" of work orders (Lang

Dep. at 80) and that the two work orders he reviewed during his deposition did not bear his

signature, which brings Lang's count of the work orders to four.  The defendants produced two

work orders dated June 7 and June 16, 2011.  Prada recalled filling out the June 16, 2011 work

order but did not recall filling out the June 7, 2011 work order.  He stated that the June 7 work

order did not contain his handwriting.  Cross approved the June 16, 2011 work order.

Barring the unavailability of parts, it usually takes one to two days after a work order

issues to fix a plumbing issue in a cell at Stateville. Downs testified that he could not tell if

plumbing repairs were occurring because plumbers worked outside of his cell.  To the extent that

work occurred, he claims that it was ineffective because during the period in question, the

plumbing issues were ongoing.  The defendants assert that the parts needed to effect a repair

were on back order, so a maintenance crew used parts from another cell to fix the problem.  They

concede, however, that the alleged repair was fleeting as the toilet/sink unit broke again.

### 5. Downs' Grievances

An emergency grievance allows an inmate to complain about a situation that poses a

substantial risk of imminent personal injury or other serious or irreparable harm.  Inmates submit

emergency grievances to the grievance office.  Staff stamp emergency grievances with the date

of receipt and forward them to the Warden's office.  Downs was under the impression that Hardy

reviewed all of the grievances filed by inmates.  However, while Hardy occasionally reviewed

emergency grievances himself, his designee generally reviewed them to determine if they

warranted immediate attention.  Hardy testified that his designee would respond to emergency

grievances based on Hardy's expectations and would bring the grievance to his attention if the designee was uncertain of his desired response. Hardy testified that grievances warranted emergency treatment (*i.e.*, a solution within twenty-four hours) if investigation showed that they were based on "serious, irreparable harm; or, you know, danger and death. That type of thing." (Hardy Dep. at 48.)

On July 6, 2011, the Grievance Office received an emergency grievance dated June 8, 2011, from Downs. That emergency grievance complained about the plumbing situation in Downs' cell and stated that Lang and Carter had "both have put in work orders" requesting repairs. The grievance was not handled as an emergency. On July 8, 2011, the Grievance Office received another emergency grievance dated June 22, 2011, from Downs. Again, the grievance was not handled as an emergency. On July 18 or 19, 2011, the Grievance Office received a third emergency grievance dated July 14, 2011, from Downs. Like the others, Stateville did not treat it as an emergency.

### 6. Downs' Access to Cleaning Supplies

There are no specific standards or requirements related to the sanitation of cells at Stateville. The parties dispute whether Downs was able to clean his cell every day. The defendants assert that inmates in E-House can use sanitary supplies, including a broom, mop, and bucket with soap and water, to clean their cells on a daily basis. In addition, Prada testified that correctional officers passed out cleaning supplies once or twice a day. Downs contends that his ability to sanitize or disinfect his cell was limited because he received a mop and bucket every few weeks and was not given any other cleaning supplies.

### 7.     Downs' Ability to Shower

Between showers, inmates can use the running water in the toilet/sink unit in their cells for daily hygiene.  Inmates at Stateville may take three showers per week if their housing unit is not on lockdown.  During lookdown, inmates are allowed one shower per week.  Downs contends that the lack of access to running water in his cell, coupled with his limited ability to shower (especially when E-House was on lockdown) and the high summer temperatures is an unconstitutional condition of confinement.  The defendants assert that Downs was permitted to take extra showers, except when his housing unit was on lockdown.

### 8.     Downs' Interactions With the Defendants

#### a.     Correctional Officer Lang

On June 1, 2011, Downs complained to Lang about the conditions in Cell E-503.  Lang checked the cell and confirmed that the toilet and sink were not working.  Lang was aware the issues in Cell E-503 were lasting for an extended period of time and was "baffled" by the amount of time the cell was "down" due to faulty plumbing.  (Lang Dep. at 71.)  Lang specifically recalled that Mims did not want to move.  Lang assumed Downs also wanted to stay in Cell E-503 because Lang believed that Downs would have been moved if he had wanted to do so. Lang testified that he told his sergeant that Downs did not want to be moved to F-House, but he was aware it was not within Downs' discretion to choose what unit or cell he was housed in.

#### b.     Correctional Officer Carter

It is undisputed that Downs spoke with Carter on a number of occasions regarding the issues in Cell E-503 and Carter was aware of those issues.  At the time of his deposition, however, Carter did not recall any specific interactions with Downs in 2011.  Downs testified

that Carter never personally took him to the utility cell to allow him to use the restroom or fill up his water bottle. Carter testified that typically, he would get permission to take an inmate with a broken toilet/sink unit to the utility cell.

### c.    Correctional Lieutenant Cross

Cross was aware that the issues in Cell E-503 were lasting for an extended period of time. As time passed, Cross became concerned that the problem had not been fixed. Cross testified that because Downs and Sims did not want to move, Stateville staff provided water, out-of-cell restroom access, daily showers, and extra cleaning supplies. At an unspecified time, Downs sent Cross a letter through the institutional mail complaining about the conditions in Cell E-503. Downs also talked with Cross numerous times regarding the conditions in the cell. Cross never personally took Downs to the utility cell so Downs could use the restroom and fill up his water bottle. Cross contends that he eventually arranged a move over the protests of Downs and Sims because the problem was no longer short-term and he could not allow them to continue to continue to utilize so much staff time.

### d.    Correctional Sergeant Prada

Prada was aware of the issues in Cell E-503 but never personally took Downs to the utility cell to allow him to use the restroom or fill up his water bottle. Prada did not recall filling out the June 7, 2011 work order. He recalled filling out the June 11, 2011 work order and believed the issues were taking longer than normal to be fixed. Prada characterized Downs' cell as "not livable" and contends that he offered Downs the chance to move but was rejected. Downs denies that Prada offered him a chance to move before his transfer to F-House.

### e. Warden Hardy

At his deposition, Hardy could not recall any interactions with Downs. The parties agree that between June 1, 2011, and July 14, 2011, Downs wrote two or three letters to Hardy and sent them through the institutional mail. In the letters, Downs told Hardy about the plumbing problems in Cell E-503 and asked to be moved to another cell.

Hardy also could not recall Downs' June 8, June 22, or July 14, 2011 emergency grievances, which were reviewed on July 7, July 8 and July 20, 2011, respectively. The grievances all contain Hardy's signature at the bottom of the page. Hardy contends that a designee signed his name because two of the grievances contained initials next to his signature and that the third signature (which was not initialed) was not his.

### f. Counselor Sanders

In 2011, Sanders worked as an inmate counselor in E-House. She made weekly rounds to visit her assigned inmates (including Downs) and typically took notes summarizing her conversations with inmates. From time to time, Sanders also spoke with inmates outside of her rounds. She did not take notes after these conversations. When inmates complain about issues with their cells, she typically advises them to inform unit staff. If necessary, she follows up with unit staff to ensure that appropriate action was taken. On the rare occasions when a maintenance issue persists over a few weeks, Sanders will personally call the maintenance staff. In the course of her job duties, Sanders does not receive or respond to emergency grievances. Sanders' responsibilities remain the same regardless of whether the facility is locked down.

Between June 1, 2011 and July 14, 2011, Downs wrote two letters to Sanders. In the letters, he described the problems in his cell and asked her to notify Hardy. In addition,

according to Downs, he spoke with Sanders in person several times and complained about the conditions in his cell, Sanders could see the broken toilet/sink unit, and Sanders promised to talk with Hardy to resolve the issue.

Sanders does not recall these conversations and does not recall following up with Hardy or any other jail staff. She testified that she would have memorialized any complaints about plumbing that inmates made during rounds in her notes, but that her notes did not reflect any conversations about this topic. She recalled complaints about plumbing made by other inmates about other cells. She further testified that she would recall if an inmate had brought this up when she was not doing rounds and that no one had ever done so.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted). Summary judgment is warranted when

the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. DISCUSSION

While "inmates cannot expect the amenities, conveniences and services of a good hotel," they are entitled to constitutionally adequate conditions of confinement. *Harris v. Fleming*, 839 F.2d at 1232, 1235-36 (7th Cir. 1988). To determine if conditions are constitutional, courts must look to "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 1236 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Eighth Amendment claims based on a prisoner's conditions of confinement have an objective and a subjective component. *McNeil v. Lane*, 16 F.3d 123, 124 (7th Cir. 1994); *see also Wilson v. Seiter*, 501 U.S. 294, 302 (1991). To satisfy the objective prong, Downs must establish that the conditions of confinement were serious enough to "result[] in a denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective prong focuses on whether officials were aware of facts supporting an inference that a substantial risk of serious harm exists and drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014).

Downs' conditions claims fall into four areas: access to a functioning toilet, access to water and other liquids, the availability of adequate cleaning products, and his ability to take sufficient showers when he could not perform any basic hygiene tasks in his cell due to the lack of running water. Downs contends that fact issues about all four of these subjects warrant denial of the defendants' motion for summary judgment. The defendants contend that summary

judgment is proper because the conditions in Downs' cell do not satisfy the objective prong and they were not deliberately indifferent.

## A. The Objective Prong—The Adequacy of the Defendants' Response to the Plumbing Issues in Downs' Cell

### 1. Access to a Functioning Toilet

"Courts have held that unsanitary conditions of confinement stemming from broken plumbing may rise to the level of an Eighth Amendment violation." *Mims v. Hardy*, No. 11 C 6794, 2013 WL 2451149, at *10 (N.D. Ill. June 5, 2013) (collecting cases); *see also Stewart v. Wexford Health Sources, Inc.*, No. 15-CV-1322-MJR, 2016 WL 37334, at *5 (S.D. Ill. Jan. 4, 2016) (exposure to human waste for a week due to a broken toilet/sink unit when the prison was on lockdown, forcing the plaintiff to be exposed to the "constant odor of urine and feces" and preventing him from washing, were "unsanitary and hazardous conditions" that "meet the objective component of a constitutional violation"); *Hicks v. Irvin*, No. 06 C 645, 2014 WL 1292541, at *6 (N.D. Ill. Mar. 31, 2014) (access to working plumbing is a "basic human necessit[y] in the prison context").

The parties dispute at length whether Downs had access to a functioning toilet and whether Downs was forced to relieve himself repeatedly in a broken toilet during the time period at issue. This includes the period when E-House was on lock down, when Carter testified that it was possible that guards would not receive permission to remove a prisoner from his cell to use an alternative toilet. The parties also dispute whether Downs was responsible for the delay in moving from cell E-503 to F-House, where he could be housed in a cell with working plumbing. The defendants do not challenge Downs' evidence indicating that a heat wave occurred at the relevant time, air circulation in Downs' cell was poor, the toilet was located inches from the

-15-

bunk beds in a six foot by ten foot windowless cell, or that Downs had to eat all of his meals near the toilet, while housed with another person, while E-House was on lockdown.

At the summary judgment stage, the court must accept Downs' contention that his access to a working toilet was, at best, sporadic. It also must accept his description of the toilet as overflowing with feces and urine and his contention (which is supported by a grievance) that he would have moved if offered the chance to do so. As one of the court's colleagues found when denying a motion for summary judgment in the conditions of confinement case filed by Bernard Mims (Downs' cellmate) based on the exact plumbing situation at issue in this case, "given the conditions Mims describes— a non-functioning sink, a broken toilet, the smell of feces, temperatures at or close to 100 degrees Fahrenheit, and poor air circulation, all for a period of 45 days—a reasonable jury could find that Mims's conditions of confinement were sufficiently serious to deprive him of the minimal civilized measures of life's necessities." *Mims v. Hardy*, No. 11 C 6794, 2013 WL 2451149, at *11 (N.D. Ill. June 5, 2013). The court agrees. It cannot resolve factual disputes at the summary judgment stage. Given Downs' evidence about the broken toilet, he has satisfied the objective element.

## 2.     Access to Water and Other Liquids

There is no constitutional right to running water in a prison cell. *Scruggs v. SinClair*, No. 3:16-CV-039 JD, 2016 WL 344534, at *2 (N.D. Ind. Jan. 27, 2016). Thus, "a lack of running water in an inmate's cell is not a constitutional violation where the inmate has access to drinking water in other prison areas." *Id*. (quoting *Williams v. Collins*, No. 14 C 5275, 2015 WL 4572311 (N.D. Ill. July 29, 2015); *see also Mims*, 2013 WL 2451149, at *9 (a short-term breakdown of an

inmate's in-cell plumbing does not rise to the level of a constitutional violation if the inmate is "otherwise provided with food, beverages, access to showers, and access to toilets").[6]

The parties dispute whether correctional officers regularly supplied Downs with water and how frequently Downs could refill his water bottle. The defendants assert that inmates in E-House usually received ice two or three times a day when temperatures exceeded 80 degrees; Downs contends that he got ice "from time to time." Prada asserts that he brought Downs extra ice; Downs denies that Prada brought any ice to his cell. The parties agree that in any event, in the prison environment, it is difficult to keep water formed from melted ice potable.

### a. The Period of Time When Downs' Plumbing Was Broken and E-House Was Not On Lockdown

When E-House was not on lockdown, Downs went to the cafeteria for lunch and dinner, where water and/or juice was available. During the week that E-House was on lockdown, Downs received his meals in his cell. The record contains evidence indicating that during lockdowns, inmates did not receive liquids with lunch or dinner as they were expected to drink from the in-cell sink. At breakfast, Downs testified that he received eight ounces of milk, Hardy testified that inmates occasionally received liquids, and Prada testified that inmates received milk or juice. When E-House was not on lockdown and his cell was experiencing plumbing problems, Downs had access to the commissary. On June 1, 2011, June 15, 2011, and July 6,

_____

[6] The court notes that the *Mims* court granted the defendants' motion for summary judgment as to Mims' Eighth Amendment claim based on lack of access to drinking water. *Mims*, 2013 WL 2541149 at *9. While Downs and Mims shared cell E-503, the record in *Mims* is different than the record before this court. Specifically, the *Mims* court found that Mims could fill his water bottle using a hose and purchase beverages from the prison commissary, and that he received water or another beverage three times a day throughout the time that the toilet/sink unit in cell E-503 was broken. *Id*. Thus, *Mims* is inapposite.

2011, he purchased jalapeno peppers, salted peanuts, and summer sausage, as opposed to beverages.

There is no constitutional right to water on demand. *Scruggs*, 2016 WL 344534, at *2. Instead, the Constitution "requires only that [an imnate] not be denied water or other beverages for an extended period of time." *Id*. (citing *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (denial of drinking water for "less than two full days" was de minimis)). Generally, a week in a cell with broken plumbing is "an inconvenience," not a constitutional violation, if the inmate receives three meals a day, each of which is accompanied by beverages. *Muhammad v. Wilson*, No. 05 C 743, 2006 WL 2413710, at *2-3 (N.D. Ill. Aug.16, 2006). However, this general rule does not take the temperature and humidity at Stateville at the relevant time into account.

Accepting Downs' version of events, when E-House was not on lockdown, he had milk with breakfast and water or juice with his lunch and dinner, plus limited opportunities to refill his water bottle and to drink water formed from melted ice. Humidity levels were elevated and the exterior temperature at times reached heat indexes of 110 degrees Fahrenheit. The record does not contain definitive information about the interior temperature but given the lack of air conditioning and the limited ventilation, it is clear that it was warmer inside Stateville than it was outside. Inmates at Stateville have suffered from heat-related illnesses and dehydration due to summer temperatures and humidity, and Downs contends that he felt "dangerously dehydrated" and had related physical symptoms such as migraine headaches.

In light of the elevated exterior temperatures and humidity, the court cannot find as a matter of law that the liquids that Downs says he received (which the court must rely on at the

summary judgment stage) satisfy the Eighth Amendment. *See Scruggs*, 2016 WL 344534 (an Eighth Amendment claim based on alleged lack of access to sufficient liquids turns on the "severity and duration of the deprivation"). In addition, Downs contends that he did not buy beverages at the commissary when he was able to shop there because he thought he would be moved or that the plumbing would be fixed. A jury will have to determine if Down's claims of dehydration due to chronic lack of access to water is consistent with his decision to purchase salty and spicy foods when given the opportunity to purchase liquids. For the period when E-House was not on lockdown, whether Downs' hydration situation satisfies the objective standard turns on disputed facts that must be resolved at trial.

> **b.      The Period of Time When Downs' Plumbing Was Broken and E-House Was On Lockdown**

When E-House was on lockdown, the temperature and humidity continued to be elevated. Downs contends that he received milk with his breakfast and otherwise had minimal access to liquids since drinks are not served with lunch and dinner and the guards did not supply him with sufficient water or ice. In contrast, the defendant officers testified that they consistently supplied Downs with water and ice. A jury will have to decide which version of events is true. Thus, with respect to the period of time when E-House was on lockdown, Downs has pointed to evidence sufficient to satisfy the objective element on the drinking water issue. *See Scruggs*, 2016 WL 344534.

### 3. Access to Cleaning Products and Showers[7]

In his response to the defendants' motion for summary judgment, Downs' able recruited counsel focuses on Downs' claims about lack of access to a working toilet and sufficient liquids. The response does not address the defendants' arguments about showers and very briefly refers to Downs' testimony about his access to cleaning products. Specifically, in the context of discussing his claim based on the purported lack of access to a working toilet, Downs contends that he lacked items necessary to "sanitize his cell."[8] (Pl.'s Resp., Dkt. 115, at 4. 12.) The absence of any substantive discussion about the cleaning product and shower claims results in waiver. *See Verrecchia v. Vill. of Elmwood Park*, No. 16 C 0397, 2016 WL 1020748, at *4 (N.D. Ill. Mar. 15, 2016) (citing *Steen v. Myers*, 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in brief amounts to abandonment of claim)).

In any event, the cleaning product and shower claims are unavailing. The cleaning supply claim appears to relate to the ability to perform general cleaning tasks, such as sweeping, mopping, and wiping down surfaces. The defendants assert that inmates in E-House, such as

---

[7] Downs did not include complaints about inadequate access to cleaning products in his grievances. (Pl. Ex. K, L, M) The defendants, however, have expressly represented that they do not wish to argue that Downs failed to exhaust any of his claims. (Dkt. 79.)

[8] Downs' Local Rule 56.1 submission contains a general reference to the lack of cleaning supplies. In his response brief, he very briefly refers to cleaning supplies in the section addressing his access to a working toilet, but does not provide any details about what he allegedly could not clean. Instead, he claims that he could not "sanitize his cell." What does this mean? Because he refers to cleaning products in the access-to-a-toilet section of his response brief, Downs may have intended to argue that he lacked supplies necessary to keep the area around the purportedly overflowing toilet clean. But this contention appears nowhere in his response brief or Local Rule 56.1 submission. The court declines to craft arguments for Downs. *See Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 689 (7th Cir. 2014). It will, instead, give his response brief a plain language reading and consider whether the alleged inability to maintain an overall appropriate level of cleanliness in his cell is unconstitutional.

Downs, can use sanitary supplies, including a broom, mop, and bucket with soap and water, to clean their cells each day. Consistent with this position, Prada testified that guards passed out cleaning supplies once or twice a day. Downs contends that he could not sanitize his cell appropriately because he was limited to using a mop and bucket every few weeks.

"[U]unhygienic conditions" combined with inmates' inability "to clean for themselves with running water or other supplies" can violate the Eighth Amendment. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). However, "[t]he mere presence of some dirt, mold, or mildew . . . does not establish the type of severe deprivation needed to establish a constitutional violation." *See Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) ("failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not [cruel and unusual punishment]"). The record is replete with evidence about the condition of the toilet/sink unit, but Downs has not identified any specific sanitation issues with other areas of his cell caused by his alleged limited access to a mop and broom. Downs has also not tied his cleaning products claim to the time period at issue, both when E-House was and was not on lockdown. The defendants are, therefore, entitled to summary judgment on this claim.

Downs' shower claim is based on the fact that during lookdown, inmates are limited to a weekly shower. It is undisputed that the lack of running water in his cell prevented Downs from washing between showers and that Downs was on lockdown in a cell with no running water during a heat wave. Nevertheless, the Seventh Circuit has held that one shower per week is constitutional. *See*, *e.g.*, *Hardaway v. Meyerhoff*, 734 F.3d 740, 744-45 (7th Cir. 2013) (rejecting conditions of confinement claim based on a weekly shower); *Myrick v. Anglin*, 496 F.

App'x 670, 675 (7th Cir. 2012) (collecting cases holding that "limiting inmates to weekly showers does not violate the Eighth Amendment").

More frequent showers may be desirable in the summer, especially when air conditioning in unavailable, temperatures soar, and inmates share close quarters. But "prison conditions can be uncomfortable and harsh without violating the Constitution." *Rankin v. Dart*, No. 13 C 4671, 2016 WL 1046570, at *3 (N.D. Ill. Mar. 16, 2016) (quoting *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)). Thus, "[t]he Eighth Amendment is not violated when the hygienic conditions in a prison do not meet the prisoner's personal standards of cleanliness." *Jordan v. Peters*, No. 95 C 4163, 2000 WL 149256, at *4 (N.D. Ill. Feb. 8, 2000) (citing *Barrett v. DeTella*, 1997 WL 94721, *3, 95 C 7269 (N.D. Ill. Feb. 28, 1997)). This is especially true given that unlike his access-to-hydration claim, Downs has not alleged that he suffered any injury as a result of taking a weekly shower while he was on lockdown in Cell E-503. *See Richard v. Cupp*, No. CIVA 08-1544, 2009 WL 840218, at *4 (W.D. La. Mar. 25, 2009) (dismissing Eighth Amendment claim based on a prison's alleged practice of forcing inmates to wear sweat-soaked clothes following exercise because the inmate failed to allege that the practice caused him to suffer an physical injury). He is not entitled to a trial on his shower claim.

**B.     The Subjective Prong—Deliberate Indifference**

As noted above, a prisoner raising an Eighth Amendment conditions of confinement claim must satisfy an objective and a subjective component. The court has found that Downs' claims based on his lack of access to a working toilet for forty-five days and the limited availability of liquids during this time satisfy the Eighth Amendment's objective component. The court turns to whether Downs has satisfied the subjective component as to these claims. To

do so, Downs must point to evidence showing that the defendants were deliberately indifferent because they knew of a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to address it. *Townsend* , 522 F.3d at 773 (citing *Farmer*, 511 U.S. at 847); *see also Mims*, 2013 WL 2451149, at *12 (prison officials are deliberately indifferent if they are "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and also draw that inference).

Negligence, gross negligence, and recklessness are insufficient to establish deliberate indifference, *Farmer*, 511 U.S. at 835, and "it is not enough to show that a prison official merely failed to act reasonably," *Mims*, 2013 WL 2451149, at *12.   Instead, deliberate indifference requires "conduct that approaches intentional wrongdoing (*i.e.*, "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). *Goodvine v. Meisner*, No. 14-CV-278-WMC, 2016 WL 1274622, at *6 (W.D. Wis. Mar. 31, 2016) (quoting *Farmer*, 511 U.S. at 835).

### 1.      Prada, Lang, Carter, and Cross

Prada, Lang, Carter, and Cross contend that they made reasonable efforts to fix the plumbing issues in Cell E-503 and offered Downs a cell in F-House shortly after he reported that he was experiencing plumbing issues in his cell.[9]  The record supports the defendants' claim that they submitted work orders to no avail.  The parties contest whether Downs could have moved to

---

[9]  The defendants contend that Downs experienced "alleged plumbing issues."  (Defs.' Memo., Dkt. 107, at 11).  But in their Local Rule 56.1 submissions, they do not dispute that the toilet/sink unit did not work on the dates in question.  Their emphasis on their purported efforts to fix the problems and to offer Downs an alternative housing assignment in F-House is inconsistent with an assertion that there was nothing to fix in Cell E-503.  The court will proceed based on the assumption, which is amply supported by uncontested facts in the record, that the toilet was unusable and there was no running water during the 45-day period at issue in this case.

a different cell any earlier than he did. The defendants say he could have done so had he asked, but that he chose to stay in Cell E-503 because they accommodated his needs for toilet access and liquids, he did not want to lose his E-House cell assignment, and he had no desire to move to F-House. Downs contends that he would have accepted any offer to move given the allegedly uninhabitable and unsanitary conditions in Cell E-503 that he endured for forty-five days and the sparse hydration he was able to obtain during an exceptionally hot and humid time at Stateville.

As in *Mims*, there is a factual dispute as to whether Prada, Lang, Carter, and Cross were deliberately indifferent despite their periodic efforts to get the plumbing fixed in Downs' cell. Given the length of time that Downs lived in a cell with a dysfunctional toilet/sink unit, and viewing the evidence in the light most favorable to Downs, "a reasonable jury could conclude that these defendants were aware of [Downs'] conditions of confinement and acted with deliberate indifference by allowing those conditions to persist for as long as they did." *Mims*, 2013 WL 2451149, at *12.

Similarly, a reasonable jury could find that these defendants were deliberately indifferent because they knew about the continued problems that were pending for a substantial amount of time but did not seasonably take steps to move Downs to another cell. Down contends that as the days turned into weeks and the weeks continued to pass, the correctional officer defendants did not, as they contend, repeatedly offer him a new cell with functional plumbing. Instead, Downs asserts that these defendants left him trapped in Cell E-503 for forty-five days in conditions that he describes as deplorable and inhumane, while knowing that the plumbing repairs continued to be unresolved over a lengthy period of time and that another cell was available. This conclusion is supported by Warden Hardy's testimony that he did not believe

that prisoners should have any input into their housing placement at Stateville.  If accepted, this testimony lends credence to Downs' assertion that he would have accepted an offer to move but did not receive one until he had endured forty-five days of sweltering temperatures while housed in a small cell with poor ventilation, a broken toilet, and no running water.  Prada, Lang, Carter, and Cross are not entitled to summary judgment as to the subjective prong of deliberate indifference.

### 2. Warden Hardy and Counselor Sanders

"Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation."  *Dobbey v. Carter*, No. 12 CV 9223, 2015 WL 5693109, at *7 (N.D. Ill. Sept. 28, 2015) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)).  The defendants argue that Hardy's designee—not Hardy—signed Downs' grievances complaining about the plumbing and that Sanders was not involved with Downs' plumbing problems.

### a. Hardy

Downs stresses that while two of his grievances contain initials next to Hardy's signature, indicating that they were signed by a designee, the signature on the June 22, 2011 emergency grievance is not initialed.  Hardy contends that while he could not recall reviewing any of Downs' emergency grievances, he did not sign the June 22d emergency grievance because he recognized that this grievance bore the signature of his designee.  Given that the designee normally signs and initials emergency grievances on Hardy's behalf and that Hardy occasionally reviews emergency grievances personally, a jury will have to determine whether to accept Hardy's disclaimer regarding the signature on the June 22d emergency grievance.

A jury will also have to determine if Hardy's disavowal of all knowledge of Down's plumbing issues is credible, given evidence in the record indicating that during the summer of 2011, Hardy made rounds in E-House approximately once a week. It is possible for a reasonable jury to credit Down's testimony about the odorous toilet filled with human waste with no running water; if so, given the length of time between the failure of the plumbing in Down's cell and his move 45 days later to F-House, a jury could find that Hardy saw these conditions during rounds and willfully ignored them. These questions cannot be resolved at the summary judgment stage. Hardy is not entitled to summary judgment.

### b. Sanders

Sanders contends that she is entitled to summary judgment because (1) she is not responsible for responding to emergency grievances and (2) although she cannot recall speaking to Down's about the plumbing in Cell E-503, if she had done so, she would have advised him to inform unit staff and followed up by calling maintenance staff if the problem persisted. She reasons that even though she does not remember speaking to Downs, if she did and then did not follow up with maintenance staff, plumbers were already trying to fix the toilet/sink unit so her call would not have made a difference. In response, Downs asserts that he is entitled to a trial because he testified that he complained to Sanders while she does not recall speaking with him, and due to her lack of recall, Sanders could not state whether she followed up with jail staff on Down's complaint as required by her job as a counselor. Downs also asserts that Sanders is on notice of Downs' complaints because he wrote her two letters between June 1, 2011 and July 14, 2011.

A disputed fact is material and, therefore, warrants a trial if resolution of that fact affects whether a defendant is entitled to summary judgment. *See*, *e.g*, *Sansone v. Kormex Metal Craft, Inc.*, No. 14 C 8418, 2016 WL 1529900, at *2 n.5 (N.D. Ill. Apr. 14, 2016). The court agrees with Sanders that the parties' differing recollections regarding Downs' alleged complaints are irrelevant and thus do not require a trial. Even assuming that Downs complained to Sanders, he does not identify anything that Sanders could have done other than pass on his complaint to maintenance staff.

Although the parties disagree about how many work orders were submitted about the plumbing problems, it is clear that Stateville maintenance staff knew about the ongoing problem. Indeed, they tried to fix it by using parts harvested from another cell to fix the toilet. It is true that it promptly broke again. But that is besides the point. Downs has not identified any evidence showing that (1) Sanders could have done anything besides follow up with maintenance staff or that (2) adding another request to fix the toilet/sink unit to the list of prior requests would have mattered. It is speculative to conclude that this would have made a difference. Thus, even accepting Downs' version of events, Sanders is entitled to summary judgment.

## IV. CONCLUSION

The defendants' motion for summary judgment [106] is granted in part and denied in part. Specifically, Downs may proceed to trial against Prada, Lang, Carter, Cross, and Hardy on his claim based on the allegedly inadequate access to a working toilet from June 1, 2011, through July 14, 2011. He may also proceed to trial against these defendants on his claim based on his access to liquids. The remainder of the defendants' motion is granted. A status is set for May

11, 2016, at 9:30 a.m.  The parties are directed to meet and confer to discuss whether a referral to

the magistrate judge for a settlement conference might be fruitful.


Date:   April 27, 2016

                                              _____
                                              Joan B. Gottschall
/cc                                         United States District Judge